IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TIC - THE INDUSTRIAL COMPANY WYOMING, INC., | ) ) ) | |
| Plaintiff, | ) ) | 4:10CV3153 |
| v. | ) ) ) | |
| FACTORY MUTUAL INSURANCE COMPANY, and IMA OF KANSAS, INC., | ) ) ) | MEMORANDUM AND ORDER ON DEFENDANT IMA'S MOTION TO DISMISS |
| Defendants. | ) ) | |

On December 19, 2011, Plaintiff TIC – The Industrial Company Wyoming, Inc. (TIC) filed a four-count amended complaint against Defendants Factory Mutual Insurance Company (FMIC) and IMA of Kansas, Inc. (IMA). (ECF No. 84.) Now before me is IMA's motion to dismiss count three of the amended complaint. (ECF No. 87.) For the following reasons, IMA's motion will be denied.

## I.   BACKGROUND

The amended complaint alleges as follows. "TIC is a corporation organized under the laws of the State of Wyoming with a principal place of business in the State of Wyoming." (Am Compl. ¶ 1, ECF No. 84.) IMA "is a corporation organized under the laws of the State of Kansas with a principal place of business in the State of Kansas." (Id. ¶ 3.) FMIC "is an insurance company organized under the laws of the State of Rhode Island with a principal place of business in Rhode Island." (Id. ¶ 2.) Both IMA and FMIC are "registered with the Nebraska Department of Insurance." (Id. ¶¶ 2-3.)

On or about April 28, 2006, TIC and Pioneer Trail Energy, LLC (Pioneer Trail) entered into a written agreement "for the engineering, construction, and procurement of an ethanol plant and related facilities located in Wood River, Nebraska." (Id. ¶ 5.) This written agreement ("the

1

Contract") required Pioneer Trail to obtain an insurance policy that would "cover various risks" associated with the ethanol plant project ("the Project"), including "damage to the work and losses arising out of delays attributable to damage to the work." (Id. ¶ 6.) This "all risks" insurance policy was to be for the benefit of both Pioneer Trail and TIC. (Id.)

Pioneer Trail used "IMA and/or [FMIC] as its insurance agent and/or broker to obtain the insurance required by the Contract," (id. ¶ 7), and FMIC issued an "all risks" insurance policy ("the Policy") on or about July 1, 2008, (id. ¶ 8). The amended complaint states that the Policy "replaced a previous policy" ("the Initial Policy"), but it does not state whether the Initial Policy was issued pursuant to the Contract, and it does not name the entity that issued the Initial Policy.[1]

According to TIC, both IMA and FMIC reviewed the Contract before the Policy was issued, and therefore they "were aware, or should have been aware[,] of the foreseeable risks of the Project and the insurance requirements in the Contract." (Id. at 9.)

On July 3, 2008, a yeast propagation tank imploded and collapsed during the initial start-up phase of the Project. (Id. ¶ 11.) This incident caused both TIC and Pioneer Trail "to incur damages," but TIC's descriptions of these damages are somewhat vague. (See id. ¶¶ 13-16.) According to the amended complaint, "Pioneer Trail incurred damages in the amount of not less than $2,350,000.00." (Id. ¶ 14.) TIC refers to these damages as "the Pioneer Trail Claims," (id.), but it is not clear whether the damages were the subject of a claim (or claims) against the Policy. The amended complaint also states that "TIC was assessed and remitted payment in the amount of not less than $2,350,000.00 for liquidated damages." (Id. ¶ 15.) TIC refers to these damages as "the Liquidated Damages Claim," (id.), though again it is not clear whether these damages were the subject of a claim against the Policy.[2]

---

[1] As discussed below, however, the amended complaint's later paragraphs suggest that FMIC issued the Initial Policy. (See Am. Compl. ¶¶ 29-32, ECF No. 84.)

[2] The amended complaint states that "Pioneer Trial should have been able to recover [the liquidated damages] under the Policy as the Policy was to be primary coverage." (Am. Compl. ¶ 15, ECF No. 84.) It does not specify, however, whether Pioneer Trail or TIC made a claim against the Policy for the liquidated damages. Also, although the amended complaint does not clearly identify the party who assessed TIC for the liquidated damages or who received the payment that was remitted by TIC, I take it that the liquidated damages were remitted to Pioneer

In any event, TIC did make a number of claims against the Policy (apart from the "claims" mentioned above). (Id. ¶ 16.) These claims, which TIC refers to collectively as "the TIC Claims," have been divided into five categories: "(1) tank demolition charges; (2) replacement and reconnection charges; (3) mitigation costs; (4) delay in start-up costs for the Liquidated Damages Claim; and (5) extended project supervision, labor, and equipment costs." (Id.) By some unspecified time, FMIC had "reimbursed and made payment under the Policy in amounts adequate to cover categories 1-3 of the TIC claims." (Id. ¶ 17.) During the fall of 2008, TIC, Pioneer Trail, and FMIC met to discuss the remaining categories, and FMIC "requested that TIC re-analyze and resubmit" the category 5 claims. (Id. ¶ 18.)

A dispute developed between TIC and Pioneer Trail about claims that had been asserted against the Policy.[3] (See id. ¶ 19.) On or about December 11, 2008, TIC and Pioneer Trail settled their dispute and entered into a written agreement ("the Agreement") that allowed TIC to "assert any of its own claims pursuant to the Policy," gave TIC "standing to assert any unpaid claims Pioneer Trail ha[d] under the Policy," and required Pioneer Trail "to remit any additional amounts received under the Policy to TIC, regardless of whether such claims [were] submitted by Pioneer Trail or TIC." (Id. ¶¶ 19-21.)

On October 8, 2009, TIC submitted to FMIC a revised category 5 damages claim "in the amount of $2,241,748.38 for extended labor and supervision [costs] and $54,965.11 for extended equipment costs." (Id. ¶ 22.) On October 27, 2009, FMIC declared that "TIC is not an insured under the Policy" and requested "that TIC verify its interest in the TIC claims." (Id. ¶ 23.) FMIC also sent a letter to Pioneer Trail's parent company on or about December 2, 2009, "asking it to confirm TIC's interest in the unresolved claims under the Policy so that [FMIC] could then proceed to resolve such claims in direct consultation with TIC." (Id. ¶ 24.)

On December 4, 2009, FMIC "sent a letter to TIC acknowledging receipt of categories 4 and 5 of the TIC Claims, but denying such claims" on the ground that "TIC is not a named insured under

---

Trail.

[3] It is not clear whether this dispute involved any of the claims discussed above.

the Policy." (Id. ¶ 25.) FMIC's letter also states "that even if TIC was an insured under the Policy," categories 4 and 5 of the TIC Claims "would not be covered under the Policy" due to certain exclusions. (Id.)

On December 8, 2009, a representative from Pioneer Trail's parent company advised FMIC "that TIC was authorized to pursue claims under the Policy in TIC's name or in the name of Pioneer Trail, but that monies paid under the Policy are to be remitted to Pioneer Trail for payment to TIC pursuant to the Agreement." (Id. ¶ 27.)

TIC sent a letter to FMIC on April 23, 2010, outlining its arguments in support of coverage for categories 4 and 5. (Id. ¶ 28.) On May 4, 2010, FMIC replied that did not act "as an agent or broker in connection with the issuance of the Initial Policy or Policy," and it claimed that when IMA applied to FMIC for insurance, it "did not request coverage for TIC's interest under the Initial Policy or the Policy." (Id. ¶¶ 29-30.) FMIC also claimed that "the first time any request for coverage of TIC's interests was made to [FMIC] was on November 4, 2008, and at that time, IMA requested that TIC be added as an additional insured to the Initial Policy and the Policy and that the endorsement adding TIC as an additional insured be back dated to the inception of the Initial Policy and the Policy." (Id. ¶ 31.) FMIC declined IMA's request on the ground that "both policies had expired at the time the request was made." (Id. ¶ 32.)

TIC filed a four-count complaint against FMIC and IMA on December 19, 2011. (See generally id.) In Count I, which is directed solely toward FMIC, TIC alleges that it is entitled to a declaratory judgment stating either that "TIC is an insured under the Policy and that the TIC Claims are covered losses under the Policy," or that "the Pioneer Trail Claims are covered losses under the Policy." (See id. ¶¶ 35-36.) In Count II, which is also directed solely at FMIC, TIC alleges that FMIC breached the terms of the Policy "by failing to remit payment for the entirety of the TIC claims and/or the Pioneer Trail Claims." (See id. ¶¶ 37-41.)[4] In Count III, which bears the heading "Equitable Subrogation," TIC alleges that "IMA and/or [FMIC] was obligated to cover all of the foreseeable risks of the Project and the insurance requirements in the Contract, and especially the

---

[4] Paragraph 40 of the amended complaint alleges that FMIC "materially breached the Contract." (Emphasis added). I take it, however, that TIC means to allege that FMIC breached the Policy, as there is no indication that FMIC was a party to the Contract.

Pioneer Trail claims as primary coverage"; "TIC has paid a debt for which IMA and/or [FMIC] is primarily liable, and which in equity and good conscience should have been discharged by the latter"; and "TIC's payment was made under compulsion or for the protection of TIC's interest and in discharge of an existing liability." (Id. ¶¶ 43-45.) In Count IV, TIC alleges that both defendants acted negligently by failing to procure insurance "that was adequate and sufficient for the foreseeable risks of the Project and the insurance requirements of the Contract." (See id. ¶¶ 47-50.)

On January 9, 2012, IMA filed a motion to dismiss Count III of the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 87.) My analysis of this motion is set forth below.

## II. STANDARD OF REVIEW

"Federal Rule of Civil Procedure 8 requires that a complaint present 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009). "[T]he pleading standard that Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Although the court must take the plaintiff's factual allegations as true when considering a Rule 12(b)(6) motion to dismiss, "[a] pleading that offers 'labels and conclusions or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555); see also Braden, 588 F.3d at 594. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 557). To meet the Rule 8 pleading standard and survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops

short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557) (internal quotation marks omitted). In other words, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'shown'–'that the pleader is entitled to relief.'" Id. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)) (brackets omitted).

### III. ANALYSIS

IMA argues that TIC's equitable subrogation claim must be dismissed because "IMA is the insurance agent, not the insurance company." (IMA's Br. at 3, ECF No. 88.) More specifically, it claims that because "IMA did not and could not issue any insurance policy," it cannot "be construed as the party that owed the debt for purposes of an equitable subrogation claim." (Id.) I disagree.

The doctrine of equitable subrogation "applies where a party is compelled to pay the debt of a third person to protect his own rights or interest, or to save his own property." Rawson v. City of Omaha, 322 N.W.2d 381, 384 (Neb. 1982) (quoting Cagle, Inc. v. Sammons, 254 N.W.2d 398, 403 (1977)). See also id. ("The doctrine of subrogation includes every instance in which one person pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter, so long as the payment was made under compulsion or for the protection of some interest of the one making the payment and in discharge of an existing liability." (quoting Sammons, 254 N.W.2d at 403)). "[T]he principle is applied to subserve the ends of justice and to do equity in the particular case under consideration. It does not rest on contract and no general rule can be laid down which will afford a test for its application in all cases. The facts and circumstances of each case determine whether the doctrine is applicable." Id. (quoting Sammons, 254 N.W.2d at 403).

IMA reasons that because it was not the insurer, it was not responsible for paying claims made against the Policy; therefore, when TIC made payments that allegedly ought to have been covered by the Policy, TIC was not paying "a debt for which [IMA] is primarily liable, and which in equity and good conscience should have been discharged by [IMA]." Rawson, 322 N.W.2d at 384 (quoting Sammons, 254 N.W.2d at 403). (See also IMA's Br. at 5-6, ECF No. 88.) In support of its argument, IMA relies heavily on Klonis ex rel. Consolidated American Insurance Company v.

Armstrong, 436 So.2d 213 (Fla. Dist. Ct. App. 1983). A brief discussion of the facts and holding in Armstrong is in order.

In November 1977, the Klonis residence was burglarized, and property valued at $98,000 was stolen. Prior to the burglary, Armstrong, an insurance agent, had obtained a homeowner's insurance policy for the Klonises from Consolidated American Insurance Company (Consolidated). The policy covered "the loss by theft of unscheduled personal property in the residence to the maximum amount of $40,000." 436 So.2d at 214. The policy also stated that its coverage "shall apply as excess insurance over any other valid and collectible insurance which would apply in the absence of this policy." Id. It contained no requirement that the Klonises acquire or maintain other primary coverage, however. After the Consolidated policy was issued–but before the burglary–the Klonises asked Armstrong to obtain a policy from Lloyd's of London that would provide coverage for "specifically described articles of personal property . . . having a total appraisal value of $128,000." Id. Although Armstrong did obtain this second policy, it was later cancelled "because Armstrong had made material misrepresentations on the policy application without the knowledge and consent" of the Klonises. Id. After the burglary, Consolidated paid $40,000 to the Klonises on their claim for the theft, and the Klonises provided Consolidated with "a release and subrogation receipt." Id. The Klonises then sued Armstrong for the amount of the uncovered loss and ultimately settled with him for $58,000. Id. Consolidated attempted to join the Klonis-Armstrong litigation as a real party in interest, seeking to recover the $40,000 that it had paid to the Klonises. Among other things, Consolidated alleged that it was entitled to recover from Armstrong on a theory of equitable subrogation. See id. at 215. More specifically, Consolidated argued that "Armstrong became in effect a primary insurance carrier by virtue of his unfulfilled promise to secure the primary insurance coverage and, therefore, became liable to Consolidated based upon equitable subrogation principles." Id. at 216-17. The court rejected this argument, noting that it was "based upon an erroneous premise, i.e., that Armstrong's legal obligation to [the Klonises] was equivalent to the insurance contract made by a primary insurance carrier." Id. at 217. The court explained, "Armstrong's liability was not coextensive with the Lloyd's policy originally issued and later cancelled. On the contrary, Armstrong's liability was for damages resulting from his negligence or breach of contract in failing to obtain insurance coverage." Id. In other words, the court held that Armstrong's liability to the

Klonises was limited to the uninsured portion of the loss. The court also noted that after the Klonises received $40,000 from Consolidated and $58,000 from Armstrong, they had no surviving "right of action against Armstrong for the $40,000 insurance proceeds to which Consolidated could become equitably subrogated." Id. at 216.

IMA claims that it, like Armstrong, is "not liable for any payments under the Policy," and "IMA's liability, if any, arises from the negligence claim based on its actions when procuring the coverage." (IMA's Br. at 6, ECF No. 88.) It states, "Even if IMA failed to procure the proper coverage, an allegation which it vehemently denies, that liability is not coextensive with, or equivalent to, the Policy. Put another way, IMA does not step into the shoes of the insurance company[,] and while it may be liable in tort, it cannot be held liable on a theory of equitable subrogation." (Id.)

It seems to me that Armstrong is distinguishable from the instant case in an important respect. In Armstrong, Consolidated's equitable subrogation claim failed because the subrogor (the Klonis family) was found to have no cause of action to recover the $40,000 from Armstrong that could be passed to the subrogee (Consolidated), because Armstrong was not responsible for the insured portion of the Klonises' loss ($40,000). No analogous finding has been made in this case. Though the amended complaint is somewhat unclear, I take it that the subrogor (Pioneer Trail) is alleged to have a cause of action to recover money from both IMA and FMIC (i.e., the Pioneer Trail claims); this cause of action is alleged to have has passed to the subrogee (TIC); and IMA and FMIC are alleged to be responsible for payments that TIC was compelled to make to Pioneer Trail due to the defendants' wrongful conduct. These allegations support a plausible equitable subrogation claim.[5]

---

[5] Put differently, TIC is not seeking to recover an amount that is analogous to the insured portion of the loss that Consolidated sought to recover in Armstrong. Because the Klonises did not actually suffer the $40,000 loss (which was covered by Consolidated's policy), Consolidated's theory of recovery depended upon an argument that Armstrong's negligence placed him in the role of primary insurer (i.e., he became responsible for the entire loss, whether insured through Consolidated's policy or uninsured by virtue of his negligence). Here, however, TIC alleges that the entire amount it seeks to recover was a loss actually suffered by the subrogor and attributable to IMA's negligence. Thus, unlike Consolidated, TIC's theory of recovery does not require that IMA be placed in the shoes of a primary insurer.

Furthermore, I find that IMA may be liable to TIC on an equitable subrogation theory even though it is "not the insurance company." As noted above, the doctrine of equitable subrogation "does not rest on contract," Rawson, 322 N.W.2d at 384 (quoting Sammons, 254 N.W.2d at 403), and I see no reason why IMA's alleged negligence cannot provide the basis for TIC's equitable subrogation claim. In Rawson, for example, a driver struck a pothole, lost control of her vehicle, and collided with two other vehicles. As a result of the accident, the driver was required to pay various claimants a total sum of $13,372.91, and her own vehicle was a total loss. She filed a lawsuit against the City of Omaha seeking damages for the loss of her vehicle and contribution for the payments made to the claimants. After a trial, the trial court found that the sole proximate cause of the accident was the negligence of the City, and it ordered the City to pay the driver for the loss of her vehicle. It also found, however, that because the driver "was not at all negligent," she "could not recover from the City under the theory of contribution." 322 N.W.2d at 384. On appeal, the Supreme Court of Nebraska noted that although the trial court's assessment of the law of contribution was correct, it would be "totally illogical" if "one who is slightly negligent may recover under the doctrine of contribution . . . but one who is not at all negligent, but who is sued and therefore makes payment, may not recover at all." Id. at 385. Thus, the court held that the driver was "entitled to recover back the money she paid in settlement of the claims under the doctrine of equitable subrogation," explaining (as noted above) that "[t]he doctrine applies where a party is compelled to pay the debt of a third person to protect his own rights or interest, or to save his own property." Id. at 384. Similarly, TIC may be able to recover the money it paid to Pioneer Trail in liquidated damages if IMA is primarily liable for this debt due to its negligence.

In its reply brief, IMA reiterates that allowing TIC to maintain "an equitable subrogation claim against IMA crosses the line between the insurance company and the insurance producer" and would amount to an attempt "to create liability for the agent that is coextensive with the insurance policy." (IMA's Reply Br. at 4, ECF No. 95.) For the reasons explained above, I disagree with this characterization of TIC's third cause of action. IMA's negligence allegedly resulted in a lack of coverage for some of the TIC Claims, which caused TIC to suffer losses, and a lack of coverage for the Pioneer Trail Claims, which caused Pioneer Trail to suffer losses that were paid by TIC. By paying the Pioneer Trail Claims, TIC allegedly paid a debt that should be borne by IMA. Also, TIC

9

is seeking to recover the amount of the actual loss; thus, unlike Consolidated in the <u>Armstrong</u> case, it is not seeking to place IMA in the shoes of a primary insurer.

In summary, I am not persuaded that the doctrine of equitable subrogation is inapplicable in this case. Taken as a whole, the amended complaint fairly alleges that TIC was compelled to pay a debt for which IMA should be liable due to its failure to procure the proper insurance. Count III states a claim that is plausible on its face, and it will not be dismissed.

**IT IS ORDERED** that IMA's motion to dismiss, ECF No. 87, is denied.

Dated February 14, 2012.

                BY THE COURT

                s/ Warren K. Urbom
                United States Senior District Judge