IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

TIC - THE INDUSTRIAL COMPANY
WYOMING, INC.,

                    Plaintiff,

          vs.

FACTORY MUTUAL INSURANCE
COMPANY,  IMA OF KANSAS, INC.,

                    Defendants.

**4:10CV3153**

**MEMORANDUM AND ORDER**

The following motions are fully submitted for ruling by the undersigned:

- TIC's Motion for Leave to Substitute Expert Witness, (filing no. 152);

- Factory Mutual's Motion to Strike Plaintiff's Supplemental Rule 26 Disclosures, (filing no. 169);

- The Motions to Strike Expert Report of Rory K. O'Farrell filed by IMA and Factory Mutual, (filing nos. 175 and 183);

- Factory Mutual's Motion to Strike the Expert Report of William Schwartzkopf, (filing no. 178).

These motions, and the facts underlying them, are interrelated.  In essence, the defendants claim the plaintiff's supplemental Rule 26 disclosure, its disclosure of Rory K. O'Farrell's expert opinions, and its disclosure of William Schwartzkopf's supplemental expert opinions are untimely under this court's progression order.  The defendants claim the plaintiff is attempting to add a new (and better) liability expert under the guise of a rebuttal expert, and it is changing its theory of damage recovery beyond the expert disclosure and discovery deadlines.  For the reasons discussed below, the plaintiff's motion to substitute O'Farrell as its liability expert will be granted, the defendants' motions to strike O'Farrell's report will be denied; and defendants' motions to strike the plaintiff's Rule 26 supplemental disclosure and Schwartzkopf's corresponding supplemental opinions will be granted.

STATEMENT OF FACTS

**A.     The Complaint**.

The plaintiff's claims arise out of a construction contract for building an ethanol plant near Wood River, Nebraska.  Pioneer Trail Energy L.L.C. ("Pioneer"),[1] the owner, contracted with TIC - The Industrial Company Wyoming, Inc. ("TIC") to build the plant.  Pioneer contacted an insurance broker, defendant IMA of Kansas, Inc. ("IMA"), to secure insurance coverage for the project.  IMA located an insurance policy through defendant Factory Mutual Insurance Company, ("FM"), and Pioneer purchased the policy.

On July 3, 2008, a yeast propagation tank at the Wood River construction site imploded.  FM paid to replace the tank, but refused to pay costs incurred due to the delayed completion of the project.  Pioneer asserted a claim against TIC for the delay costs, and TIC settled that claim.  Under the Pioneer/TIC settlement agreement, if Pioneer receives any additional money from FM for the tank implosion, Pioneer will remit that money to TIC.

TIC submitted a claim to FM for recovery of "delay in start-up costs for the Liquidated Damages Claim;" and extended project supervision, labor, and equipment costs (collectively, the "TIC Claims")" arising from the tank implosion.  (Filing No. 84, at CM/ECF p. 3, ¶ 16).  FM denied the claim, stating TIC was not a named insured under the policy, and even had it been, the TIC Claims were excluded from coverage under the policy.

TIC has filed a breach of contract claim against IMA and FM for failing to obtain insurance to cover TIC's interests and against FM for failing to pay damages as required under the policy.  (Filing No. 84).  TIC asserts claims to recover any remaining amounts owed by FM to either TIC or Pioneer for damages arising from the tank implosion.

---

[1] Pioneer is a wholly-owned subsidiary of BFE Operating Company L.L.C. and in some of the evidence offered on the parties' motions, is referred to as "BFE" or "Pioneer/BFE."

**B.      Litigation History**.

This case was originally filed by both TIC and Pioneer in the District Court of Hall County, Nebraska, on July 1, 2010.  The case was removed to this forum on August 6, 2010.  Woods & Aiken Law Firm represented the plaintiffs.

The parties' Rule 26(f) Report was filed on October 22, 2010.  (Filing No. 23).  In their statement of claims, the plaintiffs asserted:

> As a result of the Occurrence, Pioneer Trail and TIC incurred damages covered by the Policy in the form of delay in startup damages and/or soft cost damages.

(Filing No. 23, at CM/ECF p. 3).  Under the terms of the FM/Pioneer insurance policy at issue, "soft costs" are defined to include:

> Expenses over and above normal expenses at Locations undergoing renovation or in the course of construction limited to the following:
>
> (i) Construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including; the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, charges by the lenders for the extension or renewal of loans necessary.
>
> (ii) Commitment fees, leasing and marketing expenses - The cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of re-leasing and marketing due to loss of tenant(s) or purchaser(s).
>
> (iii) Additional fees - for architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction.
>
> (iv) Carrying costs - property taxes, building permits, additional interest on loans, realty taxes and insurance premiums.

(Filing No. 195-2, at CM/ECF p. 2).

3

Based on the information within the parties' Rule 26(f) Report, a final progression order was entered on October 28, 2010. (Filing No. 27). TIC's mandatory disclosures were timely served on November 5, 2010. On the issue of damages, the TIC's Rule 26(a) Report stated:

> Plaintiffs are claiming damages in the amount of $2,400,000.00 for the delay in start-up damages due to the liquidated damages incurred by TIC or the direct damages and soft costs incurred by Pioneer Trail Energy that comprised the liquidated damages amounts. Additionally, Plaintiffs are claiming damages of $2,241,748.38 for extended labor and supervision and $54,965.11 for extended equipment costs.

(Filing No. 170-3, at CM/ECF p. 4).

During a status conference with the court on March 21, 2011, the parties requested a continuance of the progression order dates. An Amended Progression Order was entered. (Filing No. 36). Under the Amended Progression Order, the plaintiffs' expert disclosure deadline was extended to July 15, 2011, and the defendants' deadline was extended to August 15, 2011.

TIC served interrogatory answers on April 18, 2011. Defendant's interrogatories 14 through 19 requested information relevant to TIC's damage calculations and claims. Each interrogatory response referenced and incorporated TIC's November 5, 2010 mandatory disclosures. (Filing No. 170-5, at CM/ECF pp. 10-13).

On July 15, 2011, the plaintiffs timely disclosed experts William Schwartzkopf and Robert Lembke to testify regarding TIC's damages and whether insurance coverage was available in the marketplace for those alleged damages. (Filing No. 101).

Lembke, plaintiff's liability expert, was retained to determine if the defendants breached their duty of care to TIC and Pioneer by failing to obtain and provide insurance coverage as requested. Lembke concluded FM and IMA breached their duties to Pioneer and TIC by failing to review, or to properly review documents available to

4

them, and failing to comply with instructions regarding securing insurance for the construction and operation of the Wood River ethanol plant. Lembke explained that Pioneer agreed to purchase builders' risk/property insurance coverage to insure Pioneer and TIC against physical damage to the project and "delay in startup" coverage for loss of income from possible delay, and it agreed to include TIC as an additional insured on the policy. Lembke's report states FM and IMA failed to issue the policy coverage requested, failed to name TIC as an additional insured or recognize TIC as an insured party under the FM policy, and acted in bad faith by not properly and fairly adjusting the claim filed by Pioneer and TIC for delayed startup coverage. (Filing No. 177-3, at CM/ECF p. 2-3).

Schwartzkopf, plaintiffs' damage expert, was retained to determine how many days the project was delayed and the resulting indirect and time-related costs incurred as a result of the Wood River tank implosion. Schwartzkopf concluded the project was delayed by 51 days, and TIC incurred additional costs of $3,147,420 as a result of the late completion of the project. (Filing No. 180-2, at CM/ECF p. 4) Schwartzkopf's damage total was derived by calculating $50,000 per day for 51 days as liquidated damages, then adding the net of time-related general conditions following settlement. (Filing No. 180-2, at CM/ECF p. 8). Schwartzkopf's initial opinion report included no assessment of the estimated actual costs Pioneer incurred due to construction delays caused by the tank implosion.

Schwartzkopf was deposed on August 18, 2011. (Filing Nos. 170-4; 180-3). Schwartzkopf did not testify regarding whether liquidated damages of $50,000 per day was a reasonable estimate of actual construction delay costs, or whether there was coverage under the FM Policy for liquidated damages. (Filing No. 180-3). Schwartzkopf testified that he was not retained to calculate any additional costs incurred by Pioneer as a result of the yeast tank implosion, and he had not formulated any opinions regarding Pioneer's alleged damages. (Filing No. 180-3, at CM/ECF p. 32, 120:1–8). Schwartzkopf

spoke to no one at Pioneer prior to rendering his opinions regarding TIC's alleged damages. (Filing No. 180-3, at CM/ECF p. 6, 17:2–10).

Lembke was deposed by the defendants on August 23, 2011. (Filing No. 177-4). During the deposition, IMA's counsel questioned Lembke regarding his relationship with E&O Plus/PAR, the E&O insurance provider for SilverStone Group. (Filing No. 154-3), at CM/ECF pp. 2-3. Lembke is a consultant for the SilverStone Group. Lembke testified that he could not recall procuring a Builder's Risk policy where the owner was the named insured and the policy covered the contractor's soft costs. He testified it was possible to have a Builder's Risk policy where the owner is the named insured and the policy insures the contractor's liquidated damages obligation, but it would be a very specialized coverage that is not generally available in the industry. Lembke further testified that if an insurance carrier issues a policy in conformance with the quotation and binder provided by the broker, the insurer has discharged its obligations. (Filing No. 177-4 (Lembke deposition), at CM/ECF p. 5-6; 184-2, at CM/ECF pp. 3-4).

The defendants served discovery on the plaintiffs. Pioneer failed to timely and fully respond to the discovery. The defendants moved to compel Pioneer's discovery responses, (Filing No. 49), and moved to extend defendants' expert disclosure deadline, explaining that their retained experts needed the outstanding discovery from Pioneer to formulate opinions. (Filing No. 46). The defendants' expert disclosure deadline was extended to September 30, 2011. (Filing No. 48).

On September 26, 2011, the court extended the defendants' expert disclosure deadline to November 15, 2011. The court granted the defendants' motion to compel on October 13, 2011, and ordered Pioneer to serve duly sworn interrogatory answers and complete responses to FM's document requests by October 25, 2011. (Filing No. 67).

A disagreement arose between TIC and Pioneer regarding: (a) the scope and extent of Pioneer's obligations to TIC under their Settlement Agreement and Pioneer's obligation to comply with the court's order on defendants' motion to compel; and (b) the

responsibility for any consequences for failure to comply with the order.  Pioneer asked to be dismissed from the case.  (Filing No. 68).  The progression schedule was again continued, and defendants' expert disclosure deadline was extended to February 15, 2012, with any rebuttal experts to be disclosed by March 16, 2012.  (Filing No. 70).

Upon its motion and the joint stipulation of the parties, Pioneer was dismissed from the case, (Filing No. 89).  Citing a conflict of interest, Woods & Aiken was granted leave to withdraw as counsel on December 12, 2011.  (Filing No. 80).  Upon the parties' motion, defendants' expert disclosure deadline was extended to March 21, 2012, with rebuttal expert disclosures due on April 23, 2012.   (Filing No.  91).

The defendants had difficulty scheduling depositions of the plaintiff's fact witnesses, and moved to extend the deadline for defendants' expert disclosures on damages, and plaintiff's rebuttal expert disclosures on damages.  The court extended defendants' deadline for expert disclosure on damages to April 20, 2012, with rebuttal expert disclosures on damages to be served by May 21, 2012.  (Filing No. 105).

In mid- to late-March, shortly before TIC's 30(b)(6) noticed deposition of FM, FM served a "supplemental production" of over 17,000 documents on TIC, including additional information relating to Pioneer's soft costs.   (Filing Nos. 98; 195-1, at CM/ECF p. 3).

During his deposition on March 20, 2012, Frances Pleska, FM's 30(b)(6) deponent, testified that before FM issued an insurance policy for the Wood River ethanol plant construction, FM had computed Pioneer's projected soft costs, (Filing Nos. 195-2, 195-3, 195-4, 195-5, 195-7 (Pleska deposition), at CM/ECF pp. 3-7, at lines 94:13-96:7, 98:1-9, 103:22-104:22, 111:7-113:4, 114:22-116:11)).  Pleska admitted these costs are relatively fixed, and other than the revenue stream, could be predicted for Pioneer with a fair degree of certainty.  (Filing Nos. 195-7 (Pleska deposition), at CM/ECF p. 8, at lines 185:8-186:12).

The defendants timely disclosed experts John M. Daly, R. Bryan Tilden, and William Kreidler on March 21, 2012.  Daly and Tilden are defense liability experts; Kreidler is a defense damages expert.

Daly opined that "liquidated damages for contractors are typically excluded from coverage, and such coverage is not available from a standard market carrier, like FM." (Filing No. 180-4, at CM/ECF p. 7).  Tilden agreed, finding there was no evidence TIC requested coverage for liquidated damages, and even had it been requested, an inland marine builders risk policy would not have been the vehicle for obtaining that specific coverage.  Tilden explained that liquidated damages are considered a direct loss to a named insured, and to recover for liquidated damage loss, TIC would have to be a named insured (not an additional insured) on a policy that covered liquidated damages.  Tilden concluded that even assuming TIC had Time Element coverage under the FM policy, its claim for liquidated damages would not have been covered.  (Filing No. 180-5, at CM/ECF p. 10).

Kreidler prepared an "Analysis of Schedule and Cost Impacts Caused By Yeast Propagation Tank Implosion," wherein he explains that the tank explosion did not cause the delay costs incurred by TIC:  "the 7/3/08 yeast tank implosion had no effect on project completion or TIC's achievement of contractual milestones, including Provisional Acceptance."  (Filing No. 180-6, at CM/ECF p. 35).

TIC contacted Rory K. O'Farrell to serve as a rebuttal insurance expert on March 23, 2012.  (Filing No. 154-1, at CM/ECF p. 2, ¶ 5).  It supplemented its Rule 26 damage disclosure on April 17, 2012.  (Filing No. 170-2).  The supplemental disclosure states TIC's damages total $3,076,014, which includes a calculation of actual delay costs, property taxes, lease payments, corporate overhead and interest expenses.   TIC's Supplemental Disclosure was based on data Pioneer provided to FM before the lawsuit was filed.  (Filing No. 195-1, ¶¶ 9-10; 195-9; 195-10; 195-11 (Anderson Deposition), at CM/ECF pp. 4-5, lines 86:21-87:22, 106:17-107:23).  Before TIC's lawsuit was filed,

FM's consultant (Vericlaim) spoke with FM's adjuster and Pioneer regarding the review of Pioneer's claim for soft costs.  (Filing No. 195-8).

TIC formally retained O'Farrell on May 2, 2012.  (Filing No. 154-1, at CM/ECF p. 2, ¶ 5).  TIC emailed defense counsel and requested a one-week extension for disclosing plaintiff's rebuttal expert.  (Filing No. 190-1, at CM/ECF p. 3).  Defense counsel permitted the extension.  (Filing No. 190-1, at CM/ECF p. 4-6).

TIC's counsel scheduled a meeting with Lembke for the afternoon of May 9, 2012. At that time, Lembke advised TIC that he believed he may have a conflict of interest.  (Filing No. 154-1, at CM/ECF p. 2, ¶ 6).  On May 10, 2012, Lembke confirmed that due to a conflict, he could not be involved in the case.  (Filing No. 154-2).  Lembke explained that IMA and his employer, SilverStone, are members of the same captive insurance group, and after consulting with SilverStone's president and CEO, Lembke was instructed to have no further involvement in the case.  (Filing No. 154-2).  Lembke explained:

> this first came up during my deposition, when one of the attorneys for the defendants asked me questions about PAR and SilverStone. Nothing was made of it, by either side at that time or thereafter. I had forgotten about it until I began to prepare to meet with you yesterday.

(Filing No. 154-2).

TIC's counsel contacted defense counsel on May 12, 2012, and requested consent to substitute another expert for Lembke.  TIC explained that it was first advised of the conflict issue on May 10, 2012, Lembke had withdrawn for reasons beyond TIC's control, and IMA had apparently been on notice of the potential problem since at least as early as August of 2011, when IMA and FM deposed Lembke.  (Filing No. 154-4).  The defendants have refused to consent to a substitution of experts.

TIC disclosed O'Farrell as an expert, along with his written expert report on May 14, 2012.  (Filing Nos. 154-1, at CM/ECF p. 2, ¶ 5; 177-2).  O'Farrell states:

- "From the standpoint of a construction insurance industry broker, IMA did not follow the custom and practice of the industry and failed to obtain the coverage required by the EPC Contract as requested by Pioneer."  (Filing No. 177-2, at CM/ECF p. 3).

- "The term "additional insured," as it is commonly used and understood in the construction insurance industry, refers to a party with the same policy coverage as the named insured unless otherwise defined in the policy."  (Filing No. 177-2, at CM/ECF p. 6).

- "From a construction insurance industry standpoint, the policies placed by IMA for the Wood River Project are not typical of policies ordinarily placed for "all-risk" insurance coverage."  (Filing No. 177-2, at CM/ECF p. 8).

- From the standpoint of a construction insurance industry broker, IMA's delivery of a certificate for the benefit of both Pioneer and its primary construction contractor, TIC, was in conformity with insurance industry custom practice for binding insurance even though IMA had no direct contact with TIC, the services were not paid by TIC, and the documentation provided to IMA and FM did not specifically mention naming TIC as an additional insured.  (Filing No. 177-2, at CM/ECF p. 9).

- "Delay in startup coverage, including liquidated damages, is commercially available in the marketplace for an EPC Contractor such as TIC."  (Filing No. 177-2, at CM/ECF p. 10).

- As commonly used and understood in the construction insurance industry, the "Evidence of Property Insurance" forms (i.e., certificates of insurance) issued by IMA to TIC indicate coverage for TIC as an additional insured with delay in startup coverage, despite the existence of clerical error in that a box was not checked."  (Filing No. 177-2, at CM/ECF p. 10).

- From a construction industry standpoint, FM failed to underwrite the Policy in accordance with the EPC Contract as required.  (Filing No. 177-2, at CM/ECF p. 11).

TIC moved to substitute O'Farrell for Lembke on May 16, 2012.  (Filing No. 152).

10

On March 21, 2012, TIC disclosed additional expert opinions to be offered by Schwartzkopf. (Filing No. 180-8, at CM/ECF p. 4). Schwartzkopf examined the reasonableness of the liquidated damages amount in the contract between TIC and Pioneer, both as of the date of the contract, and as of the summer of 2008 when the liquidated damages were demanded. Schwartzkopf concluded:

- When the contract was made, the liquidated damages amount of $50,000 per day was a reasonable estimate of the actual loss Pioneer would sustain for each day of delay in completing the project.

- When the damages were assessed in the summer of 2008, the liquidated damages amount of $50,000 per day was a reasonable estimate of the loss Pioneer actually sustained for each day of delay caused by the yeast tank implosion.

- From a construction damages evaluation standpoint, TIC's payment of liquidated damages to Pioneer as a result of the yeast tank implosion was not payment of damages for a "breach" of contract or default as those terms are used in Article 15 of the Contract.

- TIC's payment of liquidated damages in connection with the yeast tank implosion was an actual loss sustained by TIC as a result of a "delay in startup" or an "extra expense loss" as those terms are commonly understood in the construction industry.

The defendants have no record of ever receiving three of the exhibits attached to Schwartkopf's report. (Filing No. 180-11).


**Motion to Substitute Expert Witness**
(Filing No. 152)

**Motions to Strike Expert Report of Rory K. O'Farrell**
(Filing Nos. 175 and 183)


TIC moves to substitute O'Farrell for Lembke as TIC's expert liability witness, explaining Lembke recently advised TIC that he could not serve as TIC's expert due to a conflict of interest. (Filing No. 152). IMA opposes the substitution and moves to strike

Lembke's report.  IMA argues substitution should not be allowed because Lembke and plaintiff's counsel knew or should have been aware of the conflict no later than August 23, 2011, when Lembke's deposition was taken; IMA suspects TIC actually wants to change experts due to the "unfavorable deposition testimony Mr. Lembke had provided," (Filing No. 172, at CM/ECF p. 3);[2] and by the time TIC requested a substitution of experts, IMA had relied on Lembke's deposition testimony in developing its response to this case.  (Filing No. 172, at CM/ECF p. 3).  IMA also argues that O'Farrell's report must be stricken because it is not a rebuttal expert report:  It addresses the same topics raised by Lembke, and not new issues raised by defendants' liability experts.  Factory Mutual joins IMA's arguments, further explaining that its trial preparation in deposing fact witnesses and retaining experts was geared toward responding to Lembke, and it will be prejudiced if it must now repeat past discovery to fully defend this case.  (Filing No. 174, at CM/ECF p. 2).

A party's request to substitute a new expert is considered a request to modify a scheduling order and, as such, is governed by Rule 16(b) of the Federal Rules of Civil Procedure.  Lincoln Nat. Life Ins. Co. v. Transamerica Financial Life Ins. Co., 2010 WL 3892860, 2 (N.D. Ind. September 30, 2010)(allowing substitution where, during the pendency of the case, the expert was criminally convicted and incarcerated); Doctor's Associates, Inc. v. QIP Holder LLC, 2009 WL 5184404, 4 (D. Conn. 2009)(allowing substitution due to the expert's conflict of interest)  A progression order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(a)(4).

> The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements. . . . While the prejudice to the nonmovant resulting from modification of the scheduling order may also

---

[2] IMA explains it offered Lembke's deposition in response to TIC's summary judgment motion, and 18 days later, TIC wanted to substitute the expert.  (Filing No. 172, at CM/ECF p. 5-6).

be a relevant factor, generally, [the court] will not consider prejudice if the movant has not been diligent in meeting the scheduling order's deadlines.

*Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 717 (8th Cir. 2008)*.

The defendants claim the plaintiff was not diligent because it should have moved to replace its expert immediately after Lembke's deposition in August of 2011, rather than waiting eight months--after the defense expert reports were disclosed and summary judgment motions were filed.  The defendants claim the delay is attributed to either lack of diligence by plaintiff's current counsel, which entered an appearance after Lembke's deposition was taken, or an actual plan to flush out the defendants' expert opinions before disclosing and buttressing its own.  The defendants claim allowing TIC's untimely substitution at this late stage of the litigation would unduly prejudice IMA's defense, and would "condone the exact type of gamesmanship that the federal rules of civil procedure seek to prevent."  (Filing No. 172, at CM/ECF p. 3).

Having reviewed the evidence thoroughly, the court could conclude TIC waited to disclose Lembke's conflict until it was too late for the defendants to respond.  But it could also conclude the defendants, perhaps with Lembke's cooperation, waited to raise the conflict issue until the plaintiff was potentially in the position of having no expert.  Based on the record before the court, any choice between these options would be pure speculation.  The court will not attribute such nefarious motives and schemes to either counsel.

Rather, it appears the topic was broached during defense counsel's deposition questioning of Lembke, but nothing further was done about it by either side—perhaps because it was unclear that any real conflict existed.  Even Lembke seemed unsure that he had a conflict.  When the topic arose again in May of 2012, Lembke did not immediately withdraw but instead asked the SilverStone president for a decision before backing away from his commitment to be TIC's expert.

Without question, once plaintiff's counsel knew of the problem, they promptly brought it to the attention of defense counsel and the court. The court finds TIC exercised due diligence under the circumstances presented. The court further finds TIC will be substantially prejudiced is it is not permitted to name a substitute expert. Lembke was the plaintiff's sole liability expert, and denying the substitution could, in effect, summarily resolve the case in favor of the defendants. In contrast, the trial of this case is still two months away and, upon the parties' motion, could be continued again to permit a full and fair trial of all the issues. See Ferrara & DiMercurio v. St. Paul Mercury Ins. Co., 240 F.3d 1 (1st Cir. 2001) (finding no prejudice arose from substituting an expert where the plaintiff was aware of the testimony the new expert would offer, had notice of the new designation more than three months before the trial, and did not move to continue the trial).

TIC seeks to substitute Lembke with O'Farrell, and has submitted O'Farrell's report in support of that proposed substitution. The defendants move to strike the report, claiming O'Farrell's report is not a rebuttal report because it does not address new issues raised by the defense liability experts, and it cannot be considered a supplemental report because the deadline for filing such a report is long past.

Although O'Farrell was originally contacted to be a rebuttal expert, (filing no. 154-1, at CM/ECF p. 2, ¶ 5), upon Lembke's withdrawal, O'Farrell was offered as a substitute liability expert for the plaintiff. O'Farrell is not a TIC rebuttal expert, and his testimony is not being offered to supplement anyone else's testimony, including his own.

The plaintiff seeks to replace Lemke with O'Farrell. When experts are substituted, the substitute expert's report and testimony is usually limited to the subject matter and theories already espoused by the former expert. Lincoln Nat. Life, 2010 WL 3892860, at *2.

Although the substitute expert's testimony and report are generally restricted to the same subject matter as the prior expert, the substitute is

not normally required to simply adopt the prior expert's conclusions verbatim—in effect, doing little more than authenticating and confirming the prior expert's conclusions. Rather, the substitute expert "should have the opportunity to express his opinions in his own language after reviewing the evidence.

. . . .

The substitute expert must have "a similar area of expertise" [and is] permitted to conduct his own investigation and reach his own conclusions, as long as he addresses the same subject matter as [the prior expert] without meaningful changes. . . . That is not to say, however, that the substitute expert merely adopt [the prior expert's] opinion verbatim. Rather, he will be permitted to review all of the evidence, conduct his own independent analysis, and express his opinion in his own words.

Id.

Lembke opined that IMA and FM breached the duty owed to TIC by failing to issue builder's risk/property insurance coverage to insure Pioneer and TIC against both physical damage to the project and loss of income from possible delay, by failing to name TIC as an additional insured on the policy, and by failing to recognize and afford coverage to TIC as an insured party under the FM policy. O'Farrell's opinions, though worded differently, are essentially the same. If the deposition of O'Farrell reveals opinions beyond the scope of Lembke's report, the defendants may then move to exclude those opinions. Id. But for now, the court concludes O'Farrell is a suitable substitute for Lembke. See also Baumann v. American Family Mut. Ins. Co., 278 F.R.D. 614, 616 (D. Colo. 2012)(holding the substitute expert's opinions "should not stray from the subject matter" of the original expert's opinion, and to the extent the substitute expert covers new material in his deposition, the defendant may file a motion to exclude that testimony). But see Payless Shoesource Worldwide, Inc. v. Target Corp.,  2007 WL 4241850, *6 (D. Kan. November 28, 2007)(permitting a substitute expert to testify beyond the scope of the initial expert's opinions where the opposing party delivered 22,000 pages of

documents relevant to the scope and content of the expert's opinions after the initial opinions were rendered).[3]

The defendants argue that if the court permits the substitution, fees and costs should be awarded to the defendants. Specifically, they claim:

> [The court] should simultaneously award IMA the reasonable fees and costs incurred in preparing a defense to the opinions of Mr. Lembke, including the expense incurred to review and evaluate Mr. Lembke's expert report, the expense incurred to prepare for, travel to, and take Mr. Lembke's deposition, and the expense that will be incurred to take the deposition of the new expert. Additionally, IMA must be permitted to use the deposition of Mr. Lembke for any purpose at trial or to call Mr. Lembke to testify at trial.

(Filing No. 172, at CM/ECF p. 3-4).

"Generally, in cases in which courts have awarded costs and expenses associated with the substitution of an expert, there has been some evidence of bad faith, fault, or tactical maneuvering on the part of the party making the substitution." Doctor's Associates, Inc., 2009 WL 5184404, at *4. The court finds no evidence of bad faith, tactical maneuvering, or fault by TIC, particularly since IMA and FM had equal and perhaps greater knowledge of Lembke's potential conflict than the plaintiff. Costs and attorney fees will not be awarded to the defendants.[4]

---

[3]Based on the evidence of record, the defendants produced 17,000 pages of evidence after the plaintiff's initial experts had disclosed their opinions and been deposed. However, there is insufficient evidence of record to explain if anything within the 17,000 pages of documents was relevant to the liability issues in this case. If so, the plaintiff may be able to expand the scope of its new liability expert's opinions, but that issue would need to be addressed, if appropriate, by a properly supported motion.

[4] In this memorandum and order, the undersigned magistrate judge does not decide whether Lembke's deposition testimony can be offered by the defendants at trial. On the record before me, the defendants have not specifically cited to the portions they propose to offer. Moreover, Lembke's underlying conflict is a reluctance to testify in a manner that would harm IMA. Under such circumstances, the plaintiff may want to explain Lembke's conflict, leaving the jury to decide the weight to be afforded to Lembke's testimony in light of all the circumstances. If the issue of whether Lembke's testimony can be read at trial must be decided, it should be raised by separate motion and determined on a fully developed record by the presiding judge.

**Motion To Strike Plaintiff's Supplemental Rule 26 Disclosures**
(Filing No. 169)

**Factory Mutual's Motion to Strike the Expert Report of William Schwartzkopf**
(Filing No. 178).

Factory Mutual and IMA move to strike TIC's supplemental Rule 26 disclosures which were served on April 17, 2012. Factory Mutual explains:

> For the first time in this suit, TIC's New Disclosures make a claim for the "Pioneer claims" that includes soft costs related to property taxes, lease payments, corporate overhead and interest expenses allegedly incurred as a result of the yeast tank implosion. In addition, for the first time in this suit, TIC attempts to belatedly provide a damages computation/calculation for the "Pioneer claims."

(Filing No. 169, at CM/ECF p. 1-2). Factory Mutual asserts the supplemental disclosure, which was served only four days before defendants' expert witness disclosure deadline, is untimely, and is also inadequate because TIC has failed to disclose the witness and documents relied on for the new damage calculations, and has not explained how the numbers were computed. Factory Mutual argues that a "supplemental" disclosure, which does not correct inaccuracies or add information that was unavailable at the time of the initial disclosure, is improper under Rule 26(e).

Fed.R.Civ.P. 26(e) requires a party to "supplement or correct" a prior disclosure based on information later acquired. It imposes a duty on the producing party to supplement information that is incorrect or incomplete. But it does not permit adding claims and issues which could have, and should have been included in the original report, and it "does not give the producing party a license to disregard discovery deadlines and to offer new opinions under the guise of the 'supplement' label." Allgood v. Gen. Motors Corp., 2007 WL 647496, at *3 (S.D. Ind. Feb. 2, 2007), citing Beller ex rel. Beller v. United States, 221 F.R.D. 689, 695 (D.N.M. 2003)( Rule 26(e) "does not give license to sandbag one's opponent with claims and issues" which should have been raised earlier)).

See also Lindner v. Meadow Gold Dairies, Inc., 249 F.R.D. 625, 640 (D. Hawai'i 2008);
Palmer v. Asarco Inc., 2007 WL 2254343, at *4 (N.D. Okla. Aug. 3, 2007);

Under Rule 26(e), a party is under a duty to supplement "at appropriate intervals
its disclosure under subdivision (a) if the party learns that in some material respect the
information disclosed is incomplete or incorrect and if the additional and corrective
information has not otherwise been made known to the other parties during the discovery
process or in writing...." Although parties are permitted to supplement expert disclosures,
Leviton Mfg. Co., Inc. v. Nicor, Inc., 2007 WL 1306759 *4 (D.N.M. April 20, 2007)
(quoting Beller v. United States, 221 F.R.D. 696, 701 (D.N.M.2003)),

> A supplemental expert report that states additional opinions or rationales or
> seeks to "strengthen" or "deepen" opinions expressed in the original expert
> report exceeds the bounds of permissible supplementation and is subject to
> exclusion under Rule 37(c)(1). "To rule otherwise would create a system
> where preliminary [expert] reports could be followed by supplementary
> reports and there would be no finality to expert reports, as each side, in
> order to buttress its case or position, could 'supplement' existing reports
> and modify opinions previously given. This result would be the antithesis
> of the full expert disclosure requirements stated in Rule 26(a).

Cook v. Rockwell Int'l Corp., 2006 WL 3533049 *87 (D. Colo. Dec.7, 2006).

TIC may be arguing that the supplemental Rule 26 disclosure, and the
associated Schwartzkopf expert report are offered in rebuttal to defendants' expert
disclosures.  Federal Rule of Civil Procedure 26(a)(2)(D)(ii) defines rebuttal
experts as those experts presenting "evidence that is intended solely to contradict
or rebut evidence on the same subject matter identified by another party under
Rule 26(a)(2) (B) or (C)." Fed. R. Civ. P. 26(a)(2)(D)(ii).

> Rebuttal expert testimony must relate to and rebut evidence or testimony on
> the same subject matter identified by another party under Rule 26(a)(2)(B)
> or (C). Such evidence is not tied to any particular witness; it is tied to
> whether the party with the affirmative burden has presented evidence
> and/or testimony from a duly disclosed expert on the same subject matter as
> that which will be rebutted by the disclosed rebuttal expert.

18

Bleck v. City of Alamosa, Colo.  2012 WL 695138, 4 (D.Colo. 2012);  see also Plumbers
& Pipefitters Local 572 Pension Fund v. Cisco Systems, Inc., 2005 WL 1459572, at *2
(N.D. 2005)("Plaintiffs will have an opportunity to respond to Defendants' expert reports
in their rebuttal reports, including theories relied upon by Defendants experts with respect
to their affirmative defenses.").

TIC's initial disclosures, dated November 5, 2010, stated:

Plaintiffs are claiming damages in the amount of $2,400,000.00 for the
delay in start-up damages due to the liquidated damages incurred by TIC
*or the direct damages and soft costs incurred by Pioneer Trail Energy that
comprised the liquidated damages amounts.* Additionally, Plaintiffs are
claiming damages of $2,241,748.38 for extended labor and supervision
and $54,965.11 for extended equipment costs.

(Filing No. 170-3, at CM/ECF p. 4).  (emphasis added).  But the initial report of
plaintiff's expert, Schwartzkopf, never mentioned actual damages.   Instead,
Schwartzkopf calculated the total damages based on the $50,000 per day liquidated
damages as follows:

| | | |
|---|---|---|
| Actual Completion of Provisional Testing | 8/29/2008 | |
| Planned Completion of Provisional Acceptance Testing | 7/10/2008 | |
| Elapsed # of Days | 51 | |
| Liquidated Damages Rate/Day | $50,000.00 | |
| Total LD's Incurred by TIC | | $2,550,000.00 |
| Time Related Extended General Conditions | $663,140.00 | |
| Less General Conditions included in Settlement | $65,719.69 | |
| General Conditions Subtotal | | $597,420.31 |
| **Total Amount Incurred by TIC** | | **$3,147,420.31** |

(Filing No. 180-2, at CM/ECF p. 8).

The report of defendants' damages expert, Kreidler, was served on May 21, 2012.
Kreidler concluded the Wood River tank explosion did not cause the delay costs incurred
by TIC.  Kreidler's report challenged Schwartzkopf's estimate of the number of days of
delay arising from the tank implosion, concluding the implosion had no effect on when
the project was completed.  Kreidler's report does not discuss the daily costs caused by

19

the delay, and does not discuss whether liquidated damages of $50,000 per day was reasonable or, in the alternative, a penalty.  (Filing No. 180-6, at CM/ECF p. 35).

Based on the information of record, it appears the defendants concede that the $50,000 per day liquidated damages clause of the Pioneer/TIC construction contract was not a penalty and was therefore enforceable against TIC.  Nonetheless, plaintiff served supplemental Rule 26(a) disclosures on April 17, 2012 which included calculations for the actual delay costs incurred.   The supplemental disclosure calculates damages as follows:

| C. | DAMAGES: | | |
|---|---|---|---|
| | **Fixed Costs (per day)** | | |
| | Property Tax | $ | 3,175 |
| | Lease Payments | $ | 5,472 |
| | Corporate Overhead (Labor) | $ | 14,251 |
| | Corporate Overhead (Non Labor) | $ | 4,182 |
| | **Total Fixed G&A Costs** | $ | 27,079 |
| | Net Interest Expense | $ | 33,235 |
| | **Total Extra Daily Costs During Start Up Delay** | $ | 60,314 |
| | **Total Extra Daily Costs x 51 days delay** | | $3,076,014 |

(Filing No. 170-2).   The actual damage estimate in the supplemental disclosure was apparently based on additional opinions reached by Schwartzkopf.  His rebuttal report served on May 21, 2012, included the following calculations:

| 2006 estimate of 2008 daily delay costs: | | | Actual 2008 daily delay costs: | | |
|---|---|---|---|---|---|
| **DAMAGES:** | | **2008 Projected\*** | Wood River Project | | |
| **Fixed Costs (Per Day)** | | | Leasing | $13,155 | |
| Property Tax | $ | 3,175 | Operating Expense | $11,165 | |
| Lease Payments | $ | 5,472 | Other Miscellaneous | $ 2,000 | |
| Corporate Overhead (Labor) | $ | 14,251 | Total Plant Fixed Costs | | $26,320 |
| Corporate Overhead (Non Labor) | $ | 4,182 | Corporate G&A | $10,484 | |
| **Total Fixed G&A Costs** [1] | $ | 27,079 | Interest Expense | $20,000 | |
| Net Interest Expense | $ | 33,235 | | | $30,484 |
| **Total Extra Daily Costs During Start Up Delay** [1] | $ | 60,315 | **Total Fixed Costs** | | $56,804 |

(Filing No. 180-8, at CM/ECF pp. 6, 7).

TIC's initial disclosure provides a general statement that it will be pursuing damages by using either a liquidated damages assessment, or by calculating the actual

damages.  Based on TIC's initial expert reports, TIC chose to pursue recovery based on liquidated, rather than actual, damages.  Defendants' expert challenged the number of days of delay, not the cost per day, when reaching his conclusion.   Plaintiff's supplemental disclosure and the rebuttal opinions of Schwartzkopf address actual damages—a topic not discussed in the plaintiff's initial mandatory or expert disclosures, or the defendant's expert disclosures.   The plaintiff claims Mr. Schwartzkopf's supplemental/rebuttal opinions are directly relevant to the issue of whether the liquidated damages provision was reasonable or, in the alternative, so disproportionate to any possible loss as to constitute an unenforceable penalty.  (Filing No. 189, at CM/ECF p. 7)(citing Kozlik v. Emelco, Inc., 240 Neb. 525, 483 N.W.2d 114 (1992)).   But the defendant does not challenge the reasonableness or enforceability of the liquidated damages provision.

The information supporting TIC's supplemental actual damages calculations was based on data Pioneer provided to FM before the lawsuit was filed.  (Filing No. 195-1, ¶¶ 9-10).  Pioneer was a plaintiff in this case, and there is nothing of record explaining why TIC could not have used this information at the outset to calculate and serve disclosures and opinions on Pioneers' actual damages.

Plaintiff's supplemental Rule 26 disclosure dated April 17, 2012, and Schwartzkopf's supplemental opinions dated May 21, 2012, could and should have been disclosed in plaintiff's initial mandatory and expert disclosures, and they are not responsive to any claim raised by the defendant's experts.  They cannot be characterized as timely disclosed supplemental facts and opinions under Rule 26 or this court's progression order.  TIC's supplemental disclosure, (filing no. 170-2), and Schwartzkopf's supplemental/rebuttal opinions, (filing no. 180-8), must be stricken.

Accordingly,

IT IS ORDERED:

1)   TIC's Motion for Leave to Substitute Expert Witness, (filing no. 152), is granted.

2)   Factory Mutual's Motion to Strike Plaintiff's Supplemental Rule 26 Disclosures, (filing no. 169), is granted.

3)   The Motions to Strike Expert Report of Rory K. O'Farrell filed by IMA and Factory Mutual, (filing nos. 175 and 183), are denied.

4)   Factory Mutual's motion to strike the supplemental report of William Schwartzkopf dated May 21, 2012, (filing no. 178), is granted.

July 6, 2012.

BY THE COURT:

s/ *Cheryl R. Zwart*
U.S. Magistrate Judge

**This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.